FILED
06/12/2025
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 8, 2025

**STATE OF TENNESSEE v. JOHN ALLEN HESSMER**

**Appeal from the Criminal Court for Smith County**
**No. 21CR82    Dee David Gay, Judge**

_____

**No. M2023-00602-CCA-R3-CD**

_____

The Defendant, John Allen Hessmer, was convicted by a Smith County Criminal Court jury of possession of .5 grams or more of methamphetamine with the intent to sell or deliver, a Class B felony; possession of drug paraphernalia, a Class A misdemeanor; and driving while in possession of methamphetamine, a Class B misdemeanor. The Defendant raises the following issues on appeal: (1) whether the trial court erred in excluding photographs relating to his passenger, Natasha Jordan, in violation of the Defendant's due process rights to present a defense; (2) whether the trial court erred in preventing a defense witness's testimony about her knowledge of Ms. Jordan; (3) whether the trial court erred in excluding impeachment evidence relating to an arresting officer's employment history in violation of the Defendant's right to confront witnesses against him; (4) whether the State violated *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), for failing to preserve the patrol vehicle video recording of the Defendant's traffic stop; (5) whether the Defendant is entitled to a resentencing hearing due to the trial court's admission of a video recording at sentencing of the Defendant that was not beforehand disclosed by the State; (6) whether the trial judge erred by not recusing himself; and (7) whether the cumulative effect of the various alleged errors rendered the Defendant's trial unfair. Based on our review, we affirm the Defendant's convictions. However, pursuant to *State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015), we remand for the trial court to enter a corrected judgment in count three to reflect that the sentence imposed for the Defendant's misdemeanor conviction of possession of methamphetamine while driving was merged into the felony possession of methamphetamine conviction in count one.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Case Remanded**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Donnavon Vasek, Lebanon, Tennessee, (on appeal), and John Allen Hessmer, Pro Se (at trial), for the appellant, John Allen Hessmer.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Jason L. Lawson, District Attorney General; and Jack Bare and Javin Cripps, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of a June 1, 2021 undercover drug operation in which Anthony Lattimore, at the request of Sergeant Junior Fields of the Smith County Sheriff's Department, arranged to purchase methamphetamine from the Defendant at a church in Smith County. According to the State's proof at trial, earlier that day Sergeant Fields conducted a traffic stop of Mr. Lattimore based on Mr. Lattimore's having an active arrest warrant. He found methamphetamine residue and a methamphetamine pipe in Mr. Lattimore's vehicle, arrested him, and took him to the sheriff's department, where Mr. Lattimore identified the Defendant as his drug supplier and agreed to an undercover controlled purchase with the Defendant. During a conversation between Mr. Lattimore and the Defendant, which was conducted over speakerphone on Mr. Lattimore's cell phone and overheard by Sergeant Fields, the Defendant agreed to sell Mr. Lattimore one ounce of methamphetamine for $650, and Mr. Lattimore agreed to pay an additional $50 for the gasoline the Defendant would have to use to drive from his Mount Juliet home to the Smith County transaction site.

The Defendant and a passenger, Natasha Jordan[1], arrived at the church in Smith County, where Sergeant Fields and two other Smith County deputies were waiting. Officers found inside Ms. Jordan's purse in the front passenger seat of the Defendant's vehicle three plastic "baggies" containing a total of approximately 42 grams of methamphetamine and a glass methamphetamine pipe, as well as directions to the church on Ms. Jordan's cell phone. Officers also found $653 in small bills on the Defendant. The Defendant was subsequently indicted for possession of .5 grams or more of

---

[1] We use the spelling of this individual's name as it is written in the trial transcript. We note that her first name is spelled as "Natoshia" in documents that the Defendant attempted to introduce at trial and in the transcripts of other hearings.

- 2 -

methamphetamine with the intent to sell or deliver, possession of drug paraphernalia, and driving while in possession of methamphetamine.

Although the facts underlying the Defendant's convictions are relatively straightforward, the procedural history of the case is complicated. The Defendant has a history of filing pro se civil lawsuits and other complaints against various individuals, including judges.[2] Consequently, by order entered on October 1, 2021, the presiding judge for the 15th Judicial District transferred this case to a judge of the 18th Judicial District due to all the criminal court judges of the 15th Judicial District having conflicts. Following that transfer, the Defendant's appointed attorney was allowed to withdraw due to a conflict of interest, and the Defendant elected to represent himself despite the trial court's attempts to dissuade him.

The Defendant filed numerous pro se motions following the transfer of his case to the new trial court. He was eventually tried before a Smith County jury from February 21-22, 2023, with advisory counsel appointed to assist him. At the beginning of the trial, the trial court warned the Defendant that it would not tolerate the inappropriate conduct and slanderous comments the Defendant had exhibited in the past and would hold the Defendant in contempt "for every situation" in which he went "over the line." Despite that warning, the Defendant in his opening statement repeatedly impugned the reputations of the prosecutor, law enforcement officers, and the trial court by stating that they were involved in a conspiracy to destroy evidence, and that the prosecutor had committed aggravated perjury by his statements in the case. Based on those comments, the trial court found the Defendant in contempt of court five different times.

The State presented five witnesses at trial: Anthony Lattimore; Sergeant Junior Fields; former Smith County Sheriff's Department Deputy Kendra Glover, who assisted Sergeant Fields in the June 1, 2021 arrest of the Defendant and Ms. Jordan; Detective Lieutenant Dusty Hailey of the Smith County Sheriff's Department, whose duties included being the evidence custodian for the department; and Special Agent Brett Trotte of the Tennessee Bureau of Investigation, who conducted the analysis of the drugs.[3] The Defendant presented a single witness: Mary John McLemore, a longtime acquaintance of the Defendant who testified she and the Defendant were Facebook friends.

---

[2] At a pretrial hearing, the prosecutor informed the trial court that he had found thirty-four opinions in which the Defendant, acting pro se, had filed lawsuits against private individuals, state and federal officials, and state and federal entities.

[3] Special Agent Trotte testified that the crystalline substance in the largest baggie consisted of methamphetamine that weighed 29.16 grams. The combined weight of the two smaller baggies of crystalline substance, for which he did not conduct analysis due to its not exceeding the next weight threshold for an offense, was 12.04 grams.

Mr. Lattimore provided the following testimony that is relevant to the issues raised on appeal:  At the time he was stopped in his vehicle by Sergeant Fields, Mr. Lattimore had known the Defendant for approximately six months and been to the Defendant's Mount Juliet home at least seven or eight times.  That same day, he provided Sergeant Fields with the Defendant's name and agreed to arrange for the purchase of methamphetamine from the Defendant.  He was not promised anything or paid for his information or participation. He called the Defendant on his cell phone while he was at the sheriff's department sitting across the desk from Sergeant Fields.  He asked the Defendant to sell him methamphetamine, and the Defendant agreed, with some "haggl[ing] back and forth" about the location until the Defendant suggested that they meet at a church at "the Alexandria exit[.]"  As Mr. Lattimore recalled, he and the Defendant agreed on a price of $250 for half an ounce of methamphetamine, but the Defendant wanted an additional $50 for gasoline. Mr. Lattimore testified that his only communications about the drug deal were with the Defendant; he never spoke with a woman.  He never saw anyone other than the Defendant during his seven or eight visits to the Defendant's home.  Mr. Lattimore made a courtroom identification of the Defendant as the man from whom he arranged to purchase methamphetamine.

On cross-examination, Mr. Lattimore acknowledged that he had possessed methamphetamine on June 1, 2021, when Deputy Fields pulled him over, and that he knew he was "facing jail time for that[.]"  He said that he had not yet been charged with anything "for that crime" and repeated that he was not paid anything in exchange for his testimony. He testified that he had never met Natasha Jordan and did not know whether Natasha Jordan was a man or a woman.

Sergeant Fields provided the following relevant testimony to the issues raised on appeal:  On June 1, 2021, he intercepted, stopped and arrested Mr. Lattimore, who was "known to have an active warrant."  He found a methamphetamine pipe and several small brown vials with methamphetamine residue inside Mr. Lattimore's vehicle, and his initial memory was that he charged Mr. Lattimore with possession of drug paraphernalia. However, after later reviewing the warrant, he testified that he charged Mr. Lattimore with resisting stop, halt, frisk or arrest.  He agreed that the back of the warrant reflected that Mr. Lattimore pled guilty to that offense on June 3, 2021, and received a suspended sentence of six months.

Sergeant Fields further testified as follows:  On June 1, 2021, while in the Sergeant's office, Mr. Lattimore agreed to provide information about the Defendant.  Mr. Lattimore was not working as a confidential informant and did not wear a wire or purchase any drugs, and Sergeant Fields did not pay or promise Mr. Lattimore anything other than that he would speak to the district attorney on his behalf.  He and Mr. Lattimore were sitting across from each other at a desk with Mr. Lattimore's cell phone on speakerphone when Mr. Lattimore

called to arrange the drug purchase. He heard the entire conversation between the Defendant and Mr. Lattimore. He recalled that the Defendant and Mr. Lattimore discussed whether the transaction would occur at the Defendant's Mount Juliet home and that he "mouthed" to Mr. Lattimore that the Defendant had to come to Smith County. During the conversation, the Defendant agreed to sell Mr. Lattimore one ounce of methamphetamine for $650, and Mr. Lattimore agreed to pay an additional $50 for the Defendant's gasoline, for a total price of $700. Sergeant Fields had not met the Defendant at that point and, therefore, did not recognize his voice. He "just knew it was a male's voice." He never heard a female's voice.

After the transaction was arranged, Sergeant Fields, Sergeant Kendra Glover and Deputy Daniel McCoy drove in their separate marked patrol vehicles to the church, parked in different nearby hidden locations, and waited. A short time later, the Defendant, with a woman passenger, pulled into the parking lot of the church driving a white vehicle. Sergeant Fields recognized the Defendant from his driver's license photograph, alerted Sergeant Glover and Deputy McCoy that it was the Defendant, activated his blue lights, and stopped the Defendant. He took the Defendant into custody and placed him in the back seat of his patrol vehicle, while the other two officers were "dealing with" Ms. Jordan. He found $653 in small bills in the Defendant's wallet, and Sergeant Glover found three bags of methamphetamine and a glass methamphetamine pipe inside Ms. Jordan's purse. Ms. Jordan gave him consent to look at her cell phone, where he found directions to the Smith County church.

Sergeant Fields's patrol vehicle was equipped with a camera that was supposed to be activated when he turned on the vehicle's blue lights. The video recording was stored on SD cards in a locked vault in his center console. He did not have access to the locked vault and could not be certain that his camera was recording; he "just rel[ied] on the equipment working properly." Deputies did not download the files from the SD cards at the end of each shift. Instead, "whenever [they] ha[d] a preliminary hearing in General Sessions Court [and learned] that [the case was] going to go to Criminal Court, [they] . . . submit[ted] a request for the video to be printed off." He identified the video recording request form that he had signed and submitted on July 12, 2021, for the patrol vehicle footage of the incident, which was admitted as Exhibit Four. He testified that he was later advised by Lieutenant Hailey that there was no video recording of the incident.

At the end of his direct examination testimony, Sergeant Fields expressed his certainty that it was the Defendant who arranged the drug deal with Mr. Lattimore over the phone. Although he did not recognize the Defendant's voice at the time of the call, he had since "watched some of [the Defendant's] videos on [the Defendant's] Facebook page and heard quite a bit of his rambling." He testified: "So it's absolutely his voice. It was his voice that I heard."

On cross-examination, Sergeant Fields identified a document in the grand jury packet entitled "Indictment Information and Discovery" on which he had marked that there was a patrol car video recording. He explained that at the time he submitted the document form, he had not yet learned that his video equipment had malfunctioned. He agreed that the methamphetamine and the methamphetamine pipe were found in Ms. Jordan's purse and said that she was charged with possession of methamphetamine and possession of drug paraphernalia. He did not look at the Defendant's cell phone and did not check Ms. Jordan's cell phone for text messages. He did not have a recording of Mr. Lattimore's cell phone conversation with the Defendant, and Smith County officers did not have body cameras. His patrol car video equipment was triggered by the activation of his vehicle's blue lights but "it did not record."

Sergeant Kendra Glover provided the following relevant testimony: On June 1, 2021, she and Deputy McCoy acted as backup in the transaction. She drove her patrol vehicle and parked in a concealed spot on the east side of the church. The Defendant and Natasha Jordan pulled up to the church ten or fifteen minutes later. After Sergeant Fields stopped the Defendant, she approached the vehicle on the passenger side where Ms. Jordan was sitting. She ordered Ms. Jordan out of the vehicle, handcuffed her, and patted her down before placing her in the rear seat of the patrol vehicle. She then retrieved Ms. Jordan's purse from the passenger seat close to the center console, searched it, and found the three bags of methamphetamine inside. On cross-examination, she testified that her patrol vehicle's blue lights should have been on during the stop, but that she could not recall.

Detective Lieutenant Dusty Hailey testified that in June 2021, he and Lieutenant Steve Babcock were the two evidence custodians for the Smith County Sheriff's Department. He identified the words "No video" and his initials, which he wrote on Exhibit Four, as ones that he had written and signed on the video recording request form. He explained that patrol vehicle video recordings were stored on SD cards, which were not accessible to the officers. He said it was the deputy's responsibility to alert him when the memory card was full so that he could remove the card and upload it to the server. He searched for any video recording associated with the case "pretty quickly" after Sergeant Fields submitted the video recording request form on July 12, 2021, and determined that there was no video recording:

> The folder did not show that there was a video - - a card that was submitted to be uploaded or we also - - our server got full at the beginning of, I believe it was, April. So we was not able to upload anything until the County could get us another hard drive because our hard drive was full. So our server had over nearly a terabyte of information stored on it.

On cross-examination, he testified that he used a key to unlock the vault to remove the SD cards and upload recordings to the server. When questioned about his testimony that the server was full and asked where he stored the SD cards in the interim, he responded: "Next to my computer with the rest of the cards that was waiting to be uploaded." He stated that once the server was upgraded, he uploaded everything that he had. He could not recall when the server was upgraded but estimated that the cards sat beside his computer for approximately one month. He testified that if an SD card was not turned in, it would "keep recording" and "override" the previously recorded content. In his efforts to find the video recording, he searched for the entire month "[b]efore and after to make sure it was not on there." During his search, he saw other video recordings of Sergeant Fields that were recorded prior to the date of the instant case. He also searched for video recordings from the patrol vehicles of Deputy McCoy and Sergeant Glover, but those video recordings were "already recorded over."

The Defendant's witness, Mary John McLemore, testified that she was familiar with the Defendant's Facebook page and that the Defendant did not have any videos of himself posted.

After deliberations, the jury found the Defendant guilty of all counts as charged. Without sentencing the Defendant to the charge, the trial court merged the Class B misdemeanor conviction of driving while in possession of methamphetamine into the felony conviction of possession of methamphetamine with the intent to sell or deliver and sentenced the Defendant as a Range II offender to twenty years at 35% for the felony drug conviction and 11 months, 29 days at 100% for the misdemeanor conviction of possession of drug paraphernalia. The trial court also sentenced the Defendant to ten days for each of the five counts of criminal contempt for which the trial court had charged him and found him guilty during the trial. Finding the Defendant to be an offender whose record of criminal activity was extensive, the trial court ordered that the Defendant serve all his sentences consecutively, with jail credit applied to his misdemeanor drug paraphernalia sentence for the time he had spent in jail to the date of the sentencing hearing.

While his pro se motion for new trial was pending, the Defendant filed a premature notice of appeal, which this court deemed effective as of September 12, 2023, the date that the trial court denied the motion for new trial. On February 21, 2024, the Defendant filed a pro se appellate brief with this court. After the State argued that the Defendant's issues were waived for his failure to provide citation to the record, the Defendant filed a motion for the appointment of appellate counsel. By order entered on May 9, 2024, this court granted the Defendant's motion for appointed counsel and struck the Defendant's pro se brief. Thereafter, appointed appellate counsel, who had acted as advisory counsel during

the Defendant's trial, filed a new brief on the Defendant's behalf in which seven issues are raised, which we address below.

## ANALYSIS

### I. Exclusion of Evidence Related to Natasha Jordan's Gender

As his first and second issues, the Defendant contends that the trial court violated his due process rights to present a defense by excluding key evidence consisting of the "driver's license" and other photographs of Natasha Jordan, and by preventing him from questioning his defense witness, Ms. McLemore, about her knowledge of Ms. Jordan. The Defendant's purpose in seeking admission of this evidence was to show that Ms. Jordan was a man, and that it was Ms. Jordan's voice that Sergeant Fields overheard speaking with Mr. Lattimore during the cell phone conversation. The State argues that the trial court properly denied admission of the photographs because they were irrelevant and inflammatory and because the Defendant failed to comply with the rules of reciprocal discovery. The State further argues that the Defendant has waived his second issue by failing to make an offer of proof of Ms. McLemore's testimony. We agree with the State.

The record reflects that in a March 17, 2022 pretrial hearing, the Defendant complained that the prosecutor had violated discovery by not providing his requested criminal history on his "codefendant"[4] "Natoshia Jordan." When the trial court inquired whether there was any discovery that the State had not turned over, the prosecutor responded that he had run the criminal histories requested by the Defendant and reduced them to written summaries, which he had filed with the trial court, and copies were sent to the Defendant. The prosecutor said he was unable to find a criminal history or a driver's license for "Natoshia Jordan." The Defendant objected, stating that he "had found her on social media[,]" including her Social Security card and her "Florida driver's license[,]" which listed her "as a male." The trial court stopped the Defendant from expounding further on that topic, stating that it had granted his motion. At that same hearing, the trial court granted the State's motion for reciprocal discovery, setting a deadline of April 15 for the Defendant to comply.

During Ms. McLemore's trial testimony, the Defendant attempted to show her two photographs, one depicting a Social Security card and a Florida State identification and one a photograph of a woman. The State objected on the grounds of relevance, and the following transpired in the presence of the jury:

---

[4] The Defendant was indicted alone for the offenses, and we have found nothing in the record to show the disposition of Ms. Jordan's charges after her arrest.

THE COURT: Okay. Hold on just a second. Let me see the pictures, please. Okay. How are these relevant?

THE DEFENDANT: They're relevant to the person that Junior Fields said he talked to.

THE COURT: Okay. Hold on just a second. Hold on just a second. Did you ask her anything about this particular person? This is not relevant. She's not a witness. There's been no proof about her involvement other than she was there at the scene.

THE DEFENDANT: She has.

THE COURT: You ask her questions then about her. You don't need to introduce what you're introducing. Sustained.

At that point, the prosecutor requested that the relevance of the witness's testimony be further explored outside the jury's presence because "once the door is opened in front of this [j]ury, we can't close it." The trial court agreed, instructing the Defendant "to make an offer of proof as to what this witness will testify to because there is always the danger of you getting into things that can be pretty drastic." The following exchange occurred outside the presence of the jury:

THE COURT: Okay. Everybody can be seated. Now, let me put this in context here. [Defendant], we've had some outbursts from you during this trial that I've had to remind you as I've raised some findings of - - and in doing that, you have communicated to the [j]ury certain things that they don't need to hear.

And the State is concerned about - - that that might be what this witness will do as well. So I need for you to tell me what you intend this witness to testify to. We call it an offer of proof. So tell me what questions you are going to ask and what you expect her to testify to.

[THE DEFENDANT]: It's to verify that somebody else is guilty for the crime that I'm accused of.

THE COURT: How are you going to do that? The testimony shows, sir, that she was in actual possession of the methamphetamine that was going to be sold. And you're the one who did the transaction, and you're the one

who drove to the place. So how are you - - your voice is on the phone. You are the contact with Mr. Lattimore. So how do you expect to prove this?

[THE DEFENDANT]: I wasn't the one on the phone. Natasha Jordan had my phone. This is what I've been trying to tell all along. And - -

THE COURT: Okay. Hold on. How are you going to prove that?

[THE DEFENDANT]: With pictures.

THE COURT: How? That she was on the phone talking to Sergeant Fields at the time?

[THE DEFENDANT]: Uh-huh.

THE COURT: Okay. Who is going to - - who is going to identify that picture?

[THE DEFENDANT]: She can identify it.

THE COURT: Was she there? She can't do that.

[ADVISORY COUNSEL]: Judge, can I connect some of these dots?

THE COURT: Go ahead.

[ADVISORY COUNSEL]: I think everybody is confused and I think he said it from there, but I think what he's trying to get to - - he's trying to introduce - - I believe this witness knows who Ms. Natasha Jordan is. And this witness has taken some photos or obtained some photos from Ms. Jordan. One is of Ms. Jordan. The other one is of her license and social security card.

THE COURT: Okay. But she [Ms. Jordan] was the one he was with that day. I mean, if you're going to impeach her credibility, he was the one that was with her.

[ADVISORY COUNSEL]: You're missing the big point. Next, if you look at her license, it has her sex [listed] as a male. Junior Fields testified that there was a male on the phone. So I think what he's saying is Natasha Jordan is not a female, it is a male.

- 10 -

THE COURT:  Okay.  Natasha Jordan is a male?

[THE DEFENDANT]:  She's sure got a male voice.

[ADVISORY COUNSEL]:  According to her license, that's what it says.  That's the connection that he's trying to make.

[THE DEFENDANT]:  And the directions was on her phone too.

THE COURT:  Okay.  This proof is highly inflammatory and it's very, very speculative.

[THE DEFENDANT]:  Please.

THE COURT:  Hold on, sir.

[THE DEFENDANT]:  Yes, sir.

THE COURT:  All you need to do is bring this lady in here and ask her questions.  What - - if she wasn't there and heard the phone call, she can't testify to that.  So the only way you can get that in is by calling this lady.  Are you saying she is a transvestite?

[THE DEFENDANT]:  She's probably a - -

THE COURT:  You were with her, sir.  Tell me.  Are you saying she's a transvestite?

[THE DEFENDANT]:  That's a good question.

THE COURT:  So you don't know?

[THE DEFENDANT]:  Would you please look at the picture?

THE COURT:  I saw the picture, but that doesn't mean anything.  That could have happened to any - - and there's nobody there to authenticate that.

[THE DEFENDANT]:  I've heard her male voice too.

THE COURT:  Okay.

- 11 -

[THE DEFENDANT]:  I gladly will testify and authenticate it.

THE COURT:  You're going to have to be the one testifying.  I don't know what we're going to get into, but as far as these pictures and this testimony, I'm not going to allow it.  You can make that an exhibit, and we'll make it Exhibit No. B.  That will not be shown to the [j]ury.  It will be part of the record to show that I did not allow that evidence in.  Any other questions?

[Defendant], let's go.  We've got a jury waiting.

Advisory counsel informed the trial court that the Defendant had other photographs of Ms. Jordan and "of that bedside table" that he wanted to introduce.  The prosecutor stated that he had not received any of the photographs in discovery.  After some further exchange in which the prosecutor maintained that he had not received the photographs and the Defendant accused the prosecutor of lying, the trial court found that the Defendant had failed to comply with reciprocal discovery and ruled that neither the photographs nor the testimony would be admissible:

THE COURT:  And that's another reason, [Defendant].  We play by the rules here.  That's why we have Rules of Evidence.  That's why we have the Rules of Criminal Procedure.  You can put in everything.  Go ahead and put it in.  We'll make it a collective exhibit.  I'll find that this is for appeal purposes.  I'm not going to allow any of this testimony, but it will go [to] Collective Exhibit No. B.

Number one, it's not relevant.  And number two and most importantly, the State was not given reciprocal discovery notice.

When the trial court inquired whether there was anything else the Defendant wanted to question Ms. McLemore about, the Defendant responded that he just wanted her to identify the photographs.

Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004).  An abuse of discretion occurs only if "the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

- 12 -

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Authentication of evidence is governed by Tennessee Rule of Evidence 901, which provides in pertinent part that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Whether evidence has been sufficiently authenticated is within the trial court's sound discretion, and its decision will not be overturned absent an abuse of discretion. *See State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003).

Tennessee Rule of Criminal Procedure 16 provides in pertinent part:

> Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph ... tangible objects, . . ., if the item is within the state's possession, custody, or control and:
>
> (i) the item is material to preparing the defense;
>
> (ii) the government intends to use the item in its case-in-chief at trial; or
>
> (iii) the item was obtained from or belongs to the defendant.

Tenn. R. Crim. P. 16(a)(1)(F). Rule 16 further provides:

> If a defendant requests disclosure under subdivision (a)(1)(F), or (G) of this rule and the state complies, then the defendant shall permit the state, on request, to inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies or portions of these items if:
>
> (i) the item is within the defendant's possession, custody, or control; and

- 13 -

> (ii) the defendant intends to introduce the item as evidence in the defendant's case-in-chief at trial.

Tenn. R. Crim. P. 16(b)(1)(A).

We conclude that the trial court acted within its discretion in excluding the proposed photographs on several different grounds. The first of the two photographs the Defendant attempted to introduce through Ms. McLemore consists of a photocopied page containing two images: what appears to be a Florida Identification Only card for "Natoshia Desha Jordan" in which the gender is listed as male; and what appears to be a Social Security card in the same name. The second is a photograph, or a photocopy of a photograph, which depicts what appears to be the same individual, with breasts, who is wearing a sleeveless undershirt or tank top and sunglasses with a mohawk hairstyle and tattoos covering the arms, neck, and upper chest area. According to the Defendant, he obtained those images from "social media." Advisory counsel added the information that it was Ms. McLemore who somehow obtained those images. As for the proof he intended to present through Ms. McLemore's excluded testimony, the Defendant made it clear that he sought to have her identify and authenticate the photographs.

The Defendant first takes issue with the trial court's finding that he failed to comply with his reciprocal discovery obligations. He points out that he mentioned at the March 17, 2022 pretrial hearing that he had Ms. Jordan's driver's license that listed her gender as male and argues that the prosecutor was therefore aware of its existence from that date. He also notes that he requested discovery from the State regarding Natasha Jordan and her aliases and asserts that, after finding the documents on his own, he attached the photographs to a pleading he filed with the trial court in August 2022. The Defendant argues that, by doing so, he complied with reciprocal discovery by disclosing the evidence he intended to use at trial.

We disagree that the Defendant's attachment of the photographs to a motion filed with the trial court was sufficient to satisfy his obligation to provide ongoing discovery to the State. As the Defendant's counsel acknowledges in the Defendant's brief, "the Pro Se filings by [the Defendant] were voluminous and often disjointed[.]" The August 1, 2022 motion the Defendant cites as proof of his having satisfied reciprocal discovery is a lengthy, handwritten motion entitled "Appology [sic], Prayer, and Settlement et al." in which the Defendant raises numerous claims/complaints, and to which is attached a number of photocopied documents, including the above-mentioned "tank top" photograph and a mostly illegible photocopy of the Florida Identification Only card. After hearing from both the Defendant and the State on the issue of whether the photographs had been properly turned over during discovery, the trial court found the Defendant was not credible and ruled that reciprocal discovery had been violated and the photographs were not admissible.

- 14 -

The Defendant cites *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000), to argue that the excluded evidence amounted to a constitutional violation of his due process right to present a defense. In *Brown*, our supreme court held that the following factors should be considered when determining whether the exclusion of evidence constitutes a constitutional violation: "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Id.* at 433-34 (citing *Chambers v. Mississippi*, 410 U.S. 284, 298-301 (1973)).

The Defendant asserts that "the excluded evidence was critical to [his] defense because the evidence would have corroborated the defense's theory and questioned the identity of who set up the exchange." Specifically, he argues that the Florida Identification card that listed Ms. Jordan's gender as male, as well as the "photo of her appearing androgynous" "strongly suggest[] that the 'male voice' heard by Mr. Lattimore and Sergeant Fields was Jordan[,]" because Ms. Jordan may have either been born a man or have been "taking hormone therapy drugs to lower the voice to sound like a man."

The Defendant argues that the Identification card was a self-authenticating document, and that his witness could have authenticated the Identification card and other photographs through her testimony as someone who was familiar with Ms. Jordan. The Defendant further argues that the interest supporting exclusion of the evidence was not warranted because the evidence was relevant and because he complied with discovery but that even if he did not, his due process right to present his defense outweighed the interest in excluding the evidence based on violations of the rules of evidence and reciprocal discovery.

We respectfully disagree. The trial court repeatedly warned the Defendant of the dangers he faced by representing himself, and that the Defendant, as a pro se litigant, would be responsible for complying with the rules that a licensed attorney had to follow, including the rules of reciprocal discovery and the rules of evidence. Moreover, the excluded evidence was not critical to the defense. As the State points out, photographs purporting to be of Ms. Jordan's Florida Identification Only card that listed her gender as male or that showed her appearing masculine "would not inform the jury on whether Ms. Jordan spoke with a deep voice that resembled a male." This information would require the jury to speculate what Ms. Jordan's voice would sound like without any factual foundation. The Defendant also ignores the fact that both Mr. Lattimore and Sergeant Fields unequivocally identified the voice on the cell phone call as the Defendant's. As for Ms. McLemore's proposed testimony, the Defendant, given the opportunity to make an offer of proof as to what she would testify, said only that he wanted her to identify and authenticate the photographs. He did not say that she was personally acquainted with Ms. Jordan or had

- 15 -

any direct, relevant knowledge about the facts of the case, and he did not request to question her in an offer of proof to demonstrate the relevance of her testimony. We, therefore, conclude that the Defendant's first two issues are without merit.

## II. Employment History of Sergeant Fields

The Defendant next contends that his right to confront witnesses was violated when the trial court prevented him from impeaching Sergeant Fields with extrinsic evidence relating to his employment history. Specifically, the Defendant argues that the trial court improperly prevented him from questioning Sergeant Fields about an August 24, 2006 "report of misconduct" stating that Sergeant Fields admitted having been intoxicated and purchasing alcohol for an underage person at a bar in Nashville. The Defendant also sought to question Sergeant Fields about his October 27, 2006 letter of resignation from the Gallatin Police Department and about Sergeant Fields's January 31, 2020 rescinded job offer from the Lebanon Police Department, which stated that a background check revealed that Sergeant Fields had "sent unauthorized text messages to a confidential informant during [his] prior employment with the City, a violation of departmental policy." The State argues that the trial court properly exercised its discretion when it ruled that the Defendant could not question Sergeant Fields about the Gallatin Police Department work history that occurred more than ten years prior to trial and that the Defendant failed to provide in reciprocal discovery. The State also points out that the trial court did not prevent the Defendant from questioning Sergeant Fields about the rescinded job offer and argues that the Defendant waived the issue of a confrontation violation by not raising it in the motion for new trial. We agree with the State.

In the March 17, 2022 pretrial hearing, the trial court addressed the Defendant's renewed discovery request for the employment records of Sergeant Fields. The Defendant complained that the prosecutor was denying him impeachment evidence consisting of Sergeant Fields's history of having been "let go" from Wilson County, Smith County, Mason County, and Davidson County for various forms of misconduct. The trial court denied the motion at that time but told the Defendant that if he could provide supporting documentation attached to his motion, it would consider it.

In the middle of trial, just prior to Sergeant Fields's direct examination testimony, advisory counsel brought up the Defendant's desire to explore "some allegations regarding Sergeant Fields and his time at the Gallatin Police Department." Advisory counsel stated that the Defendant had learned through an open records request that Sergeant Fields had "purchased some alcohol for an underage person and he was let go from the Gallatin Police Department about that." Advisory counsel later clarified that Sergeant Fields had been asked to resign because of the incident, and that the Defendant had Sergeant Fields's letter of resignation to the Gallatin Police Department.

The trial court inquired whether the parties had addressed the matter. The prosecutor responded that they had previously discussed Sergeant Fields's employment records and that the Defendant had attempted to subpoena them several times, but that the prosecutor had never seen the documents relating to the Gallatin incident. The Defendant asked to speak "and clear up a few things" and the following transpired:

> THE COURT: No. No. And I don't mean to imply, but we've got - - you know, we've got these rules and we've got these discovery rules. And a lot of times - - I don't know if this District Attorney's Office does it. But when they ask for a reciprocal discovery, anything not turned over in reciprocal discovery is not allowed. Was there reciprocal discovery here?
>
> [THE PROSECUTOR]: Judge, there was. And I've received a very scant amount, nothing that I've seen today to amount to anything that they're trying to introduce now. What you've heard three times previously is that Sergeant Fields had been fired for [misconduct] …
>
> . . . .
>
> [THE PROSECUTOR]: . . . And they have not produced one thing. Now, we have a letter or something. And I've not seen it yet, nor have I seen it in the last ten or fifteen seconds since you asked me last time.

The prosecutor added that he believed the incident was beyond the ten-year-period and argued that it was improper not only because it was not produced in reciprocal discovery, but also because the State had not been provided notice under Rule 608. The Defendant protested that the prosecutor's statement that he had not received discovery was a lie because he had handed the prosecutor "a big old wad of paper" in the courtroom and "handed him twice reciprocal discovery in the mail." The Defendant asserted that he had given discovery to the prosecutor on July 7, 2022, in the trial court's Gallatin courtroom and again on May 17, 2022, in the current courtroom. When the trial court asked advisory counsel if he could "shed light on this about when this was turned over to the State[,]" advisory counsel responded that he did not have any personal knowledge to corroborate either side.

At the conclusion of the arguments, the trial court ruled that the evidence was inadmissible because the Defendant failed to comply with reciprocal discovery and with the requirements of Rule 608(b) of the Tennessee Rule of Evidence:

THE COURT: And if I rule against you, you're going to bring it up in front of the [j]ury and it's out. But in this particular case, the requirements of Rule 608, number one, are not met. Number two, reciprocal discovery was requested here. And the record does not reflect that the State got any notice of this until today. Because of those two principles of law, this matter with the Gallatin Police Department is too old and there's no notice given.

Had we had appropriate notice and the time to address it, then it might be different. This motion to use to impeach by this particular evidence is inadmissible. And should you bring this up in front of the [j]ury, you will not come back to court. Any other questions?

Tennessee Rule of Evidence 608(b) provides that a witness may be questioned regarding specific instances of conduct "for the purpose of attacking . . . the witness's character for truthfulness." Upon request, the trial court must hold a jury-out hearing to "determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry[]" prior to questioning regarding a specific instance of conduct. Tenn. R. Evid. 608(b)(1). Generally, the specific conduct must have occurred within ten years before the commencement of the prosecution, but older conduct may be admissible provided that

> the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of the evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect[.]

*Id.* 608(b)(2).

We agree with the State that the trial court properly excluded evidence relating to the Gallatin Police Department employment history. Though the Defendant asserted he complied with reciprocal discovery in the matter, the trial court did not find the Defendant credible. There is likewise nothing to show that he provided notice of his intent to attempt to impeach Sergeant Fields's with conduct that occurred more than ten years prior to the trial, as required by the rules of evidence.

We also agree with the State that the Defendant has waived his claim with respect to Sergeant Fields's rescinded job offer from the Lebanon Police Department for failing to question Sergeant Fields about that matter. The prosecutor informed the trial court that he had seen the rescinded job offer letter from the Lebanon Police Department, and the trial court made no ruling with respect to that evidence. The Defendant, however, did not

attempt to cross-examine Sergeant Fields about that letter. By failing to question Sergeant Fields about the letter, the Defendant has waived consideration of that issue on appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). We reject the Defendant's suggestion that he was too intimidated to question Sergeant Fields about the Lebanon Police Department rescinded job offer by the trial court's earlier warning that he would be removed from the courtroom if he brought up Sergeant Fields's Gallatin Police Department employment history. The record reflects that the pro se Defendant consulted with advisory counsel and regularly argued legal issues with the trial court during the trial.

The Defendant cites *State v. Howell*, 868 S.W.2d 238, 253-54 (Tenn. 1993) to argue that he was deprived of his constitutional rights to effectively confront witnesses and to present his defense because he was unable to adequately impeach Sergeant Fields's credibility without using the employment records. In *Howell*, this court observed that "[i]n determining whether the constitutionally improper denial of a defendant's opportunity to impeach a witness is harmless under the *Chapman v. California*, 386 U.S. 18 (1967) standard, the correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, the error was nonetheless harmless beyond a reasonable doubt." *Id.* (citations omitted).

A defendant's constitutional right to confront witnesses against him includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 430–31 (Tenn. 2000). However, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App.1994). The propriety, scope, manner, and control of the cross-examination of witnesses rests within the discretion of the trial court, and this court will not disturb the limits placed upon cross-examination by a trial court unless the court has unreasonably restricted the right. *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995).

We agree with the State that the Defendant did not raise the alleged violation of his constitutional right to confront witnesses as an issue in any of his motions for new trial. As such, we may consider the issue only for plain error. We consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue

for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

The Defendant is not entitled to plain error relief here because he cannot show that a clear and unequivocal rule of law was breached, a substantial right of his was affected, or that consideration of the alleged error is necessary to do substantial justice. We, therefore, conclude that this issue is without merit.

### III. Alleged *Ferguson* Violation

As his next issue, the Defendant contends that the State committed a *Ferguson* violation by failing to preserve the patrol car video recordings. The Defendant argues that the evidence was material and potentially exculpatory because it "would identify the 'male voice' heard by Sergeant Fields" as that of Ms. Jordan. He further argues that the officers were clearly negligent in not "submit[ting]" their SD cards when they became full, in violation of departmental protocol. The State argues that the trial court properly found that there was no *Ferguson* violation because no patrol vehicle video recordings existed. We agree with the State.

The Tennessee Supreme Court in *Ferguson* held that "the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *Ferguson*, 2 S.W.3d at 915-16). When the State has lost potentially exculpatory evidence, Tennessee courts first analyze whether the State had a duty to preserve the evidence. *Ferguson*, 2 S.W.3d at 917. If the proof demonstrates that the State has breached a duty to preserve evidence, a court must evaluate (1) the degree of negligence involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction. *Id.* The central objective is to protect the defendant's right to a fundamentally fair trial. *Id.* If, after evaluating all the factors, the trial court determines that a trial without the missing evidence would be fundamentally unfair, the trial court may dismiss the charges, deliver a curative instruction to the jury, or craft such other orders as appropriate to protect the defendant's right to a fair trial. *Id.*

The trial court addressed the Defendant's *Ferguson* motion at the March 17, 2022 pretrial hearing, at which both the Defendant and Lieutenant Hailey testified. For his part, the Defendant insisted that a patrol vehicle video recording existed because he watched it on Sergeant Fields's rearview mirror as it was being recorded, and because Sergeant Fields marked on the video request form that there was a patrol vehicle video recording. Lieutenant Hailey explained how the video recording process worked, said that Sergeant Fields could not have removed or tampered with the SD card from his vehicle, and testified that he checked the SD card from Sergeant Fields's patrol vehicle and found that no video recording existed. He stated that the video recording had not been deleted; "[t]here's not a video there." He also stated that the rearview mirror was a monitor and did not show that the patrol vehicle's video was recording. At the conclusion of the proof, the trial court accredited the testimony of Lieutenant Hailey that no video recording existed. The trial court found that the State had no duty to preserve something that never existed, and, further, that the video recording would not have been exculpatory.

The record supports the findings of the trial court. The Defendant argued the significance of Sergeant Fields's having marked on the video recording request form that there was a patrol vehicle video recording of the incident. Lieutenant Hailey, however, explained at both the hearing and at trial that the officers had no access to the SD cards and no way of knowing whether the video equipment in their vehicles was functioning. The Defendant, in his brief, asserts that Lieutenant Hailey testified at trial "that the particular event was recorded over." This is not entirely accurate. Lieutenant Hailey testified that he was unable to find any video of the incident on Sergeant Fields's SD card but was able to find video footage that was recorded prior to June 1, 2021. This suggests that the video footage of the incident was not recorded over, but that the video equipment simply malfunctioned and failed to record the Defendant's traffic stop and arrest. We, therefore, conclude that this issue has no merit.

### IV. Facebook Video Admitted at Sentencing Hearing

The Defendant next contends that he is entitled to a resentencing hearing because the trial court erroneously admitted a video recording at his sentencing hearing that the State failed to disclose as required under the *Jencks* Act or Rule 16 of the Tennessee Rules of Criminal Procedure. The State argues that suppression of the video recording was not warranted because it was not in the possession of the State, and that, regardless, the Defendant failed to show that he suffered any prejudice by the admission of the video recording.

The State presented two witnesses at the sentencing hearing: the Tennessee Department of Correction Probation and Parole officer who prepared the Defendant's presentence report and Sergeant Fields. During his testimony, Sergeant Fields agreed that

the defense argued during closing argument that no Facebook videos of himself existed, and that Sergeant Fields had committed aggravated perjury in his trial testimony about them. When asked whether he was "able to look back through evidence, namely what was found on Ms. Natoshia Jordan's phone" and whether he had found that video recording, Sergeant Fields responded in the affirmative. The State then asked to play the video recording. The trial court asked that the prosecutor first explain the substance of the video. The prosecutor stated that it was a Facebook video of the Defendant that the Defendant insisted never existed, but which Sergeant Fields had helped the prosecutor find on social media:

> It existed. And we went back and found it. And I thank God that there's young people that - - because there's a nugget of wisdom out there, if you ever put something out there on the internet it's always there, and that is true. And young people are able to find it.

After receiving the prosecutor's assurance that the video had not been in the sheriff's office, the trial court allowed it to be played at the hearing. In his continued testimony, Sergeant Fields agreed that the Defendant in the video "appear[ed] to be bragging about dealing heroin[.]"

Although the transcript of the sentencing hearing reflects that the trial court admitted the Facebook video recording as an exhibit, it is not included in the record on appeal. It is the appellant's duty to ensure that the record contains evidence relevant to the issues raised on appeal. S*ee* Tenn. R. App. P. 24(b); *State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993) (noting that defendant's failure to provide the court with the complete record relevant to issues presented constitutes waiver of those issues). Furthermore, the Defendant cannot show that he was prejudiced in sentencing by the admission of a video recording of his bragging about his drug sales. Because the Facebook video recording was not introduced as a trial exhibit, there was no discovery violation. The trial court had the Defendant's presentence report, which reflected the Defendant's lengthy criminal history that included prior drug offenses, heard the evidence at the instant trial that showed the Defendant was involved in the sale of drugs and was able to view the demeanor and attitude of the Defendant throughout the proceedings. We conclude that this issue is without merit.

### V. Denial of Motions to Recuse

The Defendant next contends that the trial judge "erred when he did not disqualify himself from presiding over the initial contempt hearing and ultimately erred in not recusing himself from the entire trial because the contempt charges involved disrespect and criticism of the [trial judge] and the court's impartiality can easily be questioned." The State argues that the Defendant waived appellate consideration of the motion to recuse in

the indirect contempt proceedings by failing to provide an adequate record for review, and that the trial judge properly denied the Defendant's numerous motions to recuse. We agree with the State.

The record reflects that the State filed a petition for criminal contempt on June 20, 2022, alleging that the Defendant committed criminal contempt for filing a fourth motion for the trial judge to recuse himself after the trial court had ordered that the Defendant should not file any more motions under penalty of contempt, and that the Defendant committed five additional counts of criminal contempt for attempting to subpoena the Smith County District Attorney, the Smith County Sheriff, an assistant public defender, a criminal court judge, and a retired trial court judge when the trial court had ordered that the Defendant, before attempting any further subpoenas, provide the trial court with a list of witnesses for the trial court to make a determination of whether they were relevant to the trial. The record also contains the Defendant's June 28, 2022 "Non-waiver of contempt judge disqualification[,]" and the Defendant's July 1, 2022 "Notice of Appeal of Contempt Orders."

The record does not include a transcript of the contempt hearing or the trial court's order regarding the State's petition. "It is the duty of the appellant to prepare a record which conveys a fair, accurate, and complete account of what transcribed in the trial court with respect to the issues which form the basis of the appeal." Tenn. R. App. P. 24(b); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) (citing *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987)). In the absence of an adequate record, we generally presume that the trial court's ruling was correct. *See Oody*, 823 S.W.2d at 559. Thus, we agree with the State that the Defendant's failure to include an adequate record on appeal results in the waiver of whether the trial judge erred by not recusing himself from considering the State's petition for contempt.

The Defendant contends that the trial judge should have also recused himself from sentencing the Defendant on the five counts of criminal contempt committed at trial and should have recused himself from the motion for new trial because the five counts of criminal contempt were based in part on the Defendant's having personally disrespected the trial judge. The Defendant asserts that a speech the trial judge made about the Defendant after denying another one of the Defendant's recusal motions [5] "clearly indicates that the court was partial when making [its] ruling."

"A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." Tenn. Sup. Ct. R.10 § 2.11 (A). Bases for

---

[5] As the State notes in its brief, it is unclear from the record how many motions to recuse were filed by the Defendant.

- 23 -

which a judge's impartiality might reasonably be questioned include when "[t]he judge has a personal bias or prejudice concerning a party or a party's lawyer" or when the judge "has made a public statement, other than in a court proceeding, judicial decision, or opinion, that commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy." Tenn. Sup. Ct. R. 10, § 2.11 (A)(1), (5). "[T]he test for recusal requires a judge to disqualify himself or herself in any proceeding in which a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *State v. Clark*, 610 S.W.3d 739, 744 (Tenn. 2020) (internal quotations and citation omitted). We review a trial court's denial of a motion to recuse *de novo*. Tenn. Sup. Ct. R. 10B § 2.01.

The Defendant has not shown any reason that the trial judge's impartiality could reasonably be questioned. Though the trial proceedings were at times contentious, the record reflects that the trial judge treated the Defendant with respect, courtesy, and fairness. We disagree with the Defendant's claim that the trial judge's comments made just prior to imposing sentence demonstrated that the trial judge had developed a personal bias against the Defendant or gave rise to an appearance of the trial judge's partiality. In those comments, the trial judge chastised the Defendant for selling methamphetamine - - the crime for which the Defendant had been convicted - - and for not caring about anything but himself. The trial judge also made observations about the Defendant's lack of respect for the rule of law and his repeated attempts to create a conflict to use in a recusal motion:

> The attitude that you exhibit needs to be a warning to all criminal court trial judges and all criminal court of appeals judges because there is a new breed of defendants that are out to destroy and reject the rule of law. And, most importantly - - I've mentioned this - - by destructing the process, you're trying to create a conflict. Now that's nothing new. But a person who spends seven days a week, 24 hours a day, in jail devising conflicts to bring up in recusal motions.

The above comments echo the trial court's observation in its July 13, 2022 written order denying the Defendant's fourth motion to recuse, in which it found that the Defendant was purposefully trying to create a conflict with the trial judge. The trial court's written order denying the fourth motion to recuse reads in pertinent part:

> The Court finds that in these allegations [grounds raised by the Defendant in his fourth motion to recuse] this Court can continue to be fair and impartial by a subjective standard and by an objective standard.

In another motion filed by the Defendant on July 1, 2022, *Biased Judicial Usurper Writ of Habeas Corpus*, the Defendant further attempted to disqualify the Court. In this motion the Defendant stated

> . . . along with this writ is a detailed list of the near countless abuses of the office of the judiciary by the Respondent, i.e. '[trial judge] cases' proving that [the trial judge], the Respondent, is a low-life piece of s--- and should be hung from the nearest stout limb from the courthouse to set an example for all to see that the judicial bench should never be 'used for evil'!!! (emphasis supplied)

The Court addressed this crude and degrading statement with the Defendant and ordered the Defendant not to file pleadings of this nature. The [C]ourt finds that this Defendant is filing motion after motion in this case and is attempting to create a conflict with this Court so that the Court will recuse himself. This Court is fully aware of this attitude, having experienced this with many other defendants, and this Court can be fair and impartial with this Defendant under any circumstance that should arise as the Court presides over three (3) separate cases[6] transferred from the Presiding Judge of the Fifteenth Judicial District.

In our view, the trial court's comments were well-warranted by the Defendant's words, pleadings, actions, and attitude throughout the proceedings. We, therefore, conclude that this issue is without merit.

## VI. Cumulative Error

Finally, the Defendant contends that the cumulative effect of the various errors prevented him from receiving a fair trial. "The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (citations omitted). However, "[t]o warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *Id.* Because we have concluded that the trial court did not commit any errors, this issue has no merit.

---

[6] The State ultimately nolle prosequied the Defendant's criminal charges from a pending case in Wilson County, and the trial judge recused himself from hearing the Defendant's separate pending Smith County Criminal Court case.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court but remand for entry of a corrected judgment in count three to reflect the sentence imposed for the Defendant's Class B misdemeanor conviction.

s/ JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE